## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 24-40832 |
| Perspectives, Inc., | Chapter 11 Case (Subchapter V) |
| Debtor.[1] | |

## PLAN OF LIQUIDATION FOR SMALL BUSINESS UNDER CHAPTER 11

### INTRODUCTION

Perspectives, Inc. (the "Debtor") proposes the following Chapter 11 Plan of Liquidation (the "Plan") pursuant to the provisions of the Bankruptcy Code.

Prior to voting to accept or reject this Plan, all creditors are encouraged to read and review the Plan, including Article 2, which provides (a) background information regarding the Debtor and the purpose for commencing this Chapter 11 Case; (b) a description of the liquidation analysis; and (c) a description of plan projections. No solicitation materials have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

Subject to certain restrictions and requirements set forth in section 1129 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation. This Plan proposes a liquidation of the Debtor's assets to allow the Debtor to make payments to holders of Allowed claims under the terms set forth in this Plan.

### ▮ Article 1: Defined Terms

#### 1.1 Defined Terms in Bankruptcy Code.

The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005 and 11 U.S.C. § 342(c), as applicable, the Debtor's address is 3381 Gorham Avenue, St. Louis Park, Minnesota 55246 and its Employer Identification Number (EIN) is 41-1288300.

### 1.2    Additional Defined Terms.

(1)    "<u>Administrative Expense</u>" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code asserted against the Debtor.

(2)    "<u>Allowed</u>" means with respect to any claim: (a) a proof of claim or a claim that has been scheduled by the Debtor in its Schedules as other than disputed, contingent, or unliquidated and as to which the Debtor or any other party-in-interest has not filed an objection; (b) a claim that either is not a Contested Claim or has been allowed by a Final Order; or (c) a claim that is allowed in a stipulation or settlement executed prior to or after the Effective Date; and with respect to all claims, only after reduction for applicable setoff and similar rights of the Debtor.

(3)    "<u>Apartment Properties</u>" means collectively the Journey Property, Harmony Property, Serenity Property, Sanctuary Property, and Wisdom Property.

(4)    "<u>Assumed Agreement</u>" means a contract, lease, or other agreement listed on **Exhibit C**.

(5)    "<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

(6)    "<u>Bankruptcy Rule</u>" means a Federal Rule of Bankruptcy Procedure.

(7)    "<u>Bremer</u>" means Bremer Bank, National Association.

(8)    "<u>Chapter 11 Case</u>" means the Debtor's pending case under the Bankruptcy Code, identified in the caption at the top of this Plan.

(9)    "<u>City Parties</u>" means, collectively, the City of Edina and the City of St. Louis Park.

(10)    "<u>Claim Filing Deadline</u>" means July 31, 2024, except for governmental units, which shall be September 24, 2024.

(11)    "<u>Confirmation Date</u>" means the date on which the Confirmation Order is entered.

(12)    "<u>Confirmation Order</u>" means the order entered by the Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

(13)    "<u>Contested Claim</u>" means: (a) a claim that was scheduled by the Debtor in its Schedules as a disputed, contingent, or unliquidated claim and that has not been otherwise Allowed; (b) a claim that is not an Allowed claim because the Debtor or other party in interest has objected to allowance of the claim under sections 502(b) or 503 of the Bankruptcy Code and Bankruptcy Rule 3007; (c) any secured or unsecured portions of a secured claim that is the subject of a motion for determination of the value of security under section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012; (d) any claim held by a creditor against which the Debtor has demanded the recovery of property pursuant to section 502(d) of the Bankruptcy Code, without regard to whether such claim was previously an Allowed claim; (e) a claim that is subject to final adjudication in a proceeding outside the Court against one or more of the Debtor's insurers; or

#82203482v4

(f) a claim whose validity or amount is subject to determination in an adversary proceeding that has not been resolved by a Final Order.

(14)    "Court" means the United States Bankruptcy Court for the District of Minnesota, or such other court of competent jurisdiction which properly exercises jurisdiction over part or all of the Chapter 11 Case.

(15)    "Debtor" means Perspectives, Inc.

(16)    "Effective Date" means the first business day following the date that is 14 days after the entry of the Confirmation Order.

(17)    "Family Center" means the real property located at 3381 Gorham Avenue, St. Louis Park, MN 55426.

(18)    "Family Housing" means Family Housing Fund.

(19)    "Harmony Property" means the real property located at 2768 Louisiana Court, St. Louis Park, MN 55426.

(20)    "Hennepin County" means, collectively, the County of Hennepin and the Hennepin County Housing & Redevelopment.

(21)    "Huntington" means Huntington National Bank.

(22)    "IRS" means the Internal Revenue Service.

(23)    "Journey Property" means the real property located at 2760 Louisiana Court, St. Louis Park, MN 55426.

(24)    "Lindstrom" means Lindstrom Cleaning & Construction, Inc.

(25)    "Liquidating Fund" means the fund established by Article 9 of the Plan to hold all property of the estate.

(26)    "Liquidating Agent" means the person or entity with the powers and duties described in Article 9 of the Plan, which will initially be STL Consulting, Inc.

(27)    "MHFA" means Minnesota Housing Finance Agency.

(28)    "MNDR" means the Minnesota Department of Revenue.

(29)    "Oversight Committee" means the committee with the powers and duties described in Article 9 of the Plan, which will initially have four members: Susan Grafton, James Kremer, Patricia Weller, and Dawn Courrier. The Oversight Committee may act with as few as two members.

(30)    "Petition Date" means March 28, 2024.

3

(31)  "Plan" means this chapter 11 plan of reorganization as amended, revised, or modified.

(32)  "ProBuild" means ProBuild Company, LLC.

(33)  "Propel" means Propel NonProfits.

(34)  "Schedules" means the Debtor's schedules of assets and liabilities and the statement of financial affairs on file with the Clerk of the Bankruptcy Court, as amended or modified in accordance with Bankruptcy Rule 1009.

(35)  "Sanctuary Property" means the real property located at 2759 Louisiana Court, St. Louis Park, MN 55426.

(36)  "Serenity Property" means the real property located at 2753 Louisiana Court, St. Louis Park, MN 55426.

(37)  "Wisdom Property" means the real property located at 2765 Louisiana Court, St. Louis Park, MN 55426.

(38)  "Yale Mechanical" means Yale Mechanical LLC.

**1.3    Exhibits.**

All exhibits to the Plan are hereby incorporated by reference and made part of the Plan as if set forth fully in the Plan.  The exhibits to the Plan including the following:

Exhibit A      Liquidation Analysis

Exhibit B      Cash Flow Projections

Exhibit C      Assumed Agreements

Exhibit D      Oversight Committee Bylaws

**Article 2: Background Information Regarding the Debtor**

**2.1    Description and History of the Debtor's Business.**

The Debtor is a Minnesota non-profit corporation formed in 1976, with a principal place of business in St. Louis Park, Minnesota.  Additional background information regarding the Debtor may be found in the Declaration of Susan Grafton in Support of Chapter 11 (Subchapter V) Petition and First Day Motions (ECF No. 7).

The Debtor was forced to file this case after discovering that its former CFO failed to comply with payroll tax requirements and concealed such failures from the Debtor's board, resulting in significant tax liabilities owed to the Internal Revenue Service and the Minnesota Department of Revenue. In addition to these tax liabilities, the Debtor also discovered its overall

#82203482v4

short-term debt and balloon mortgage were coming due. Despite the Debtor's best efforts, the Debtor was unable to raise money to pay these outstanding liabilities and the Debtor's cash flow remained insufficient to satisfy the required debt service. Facing potential garnishments and a lack of operating funds, the Debtor filed this case on the Petition Date to preserve its assets for the benefit of all the Debtor's creditors.

### 2.2    Liquidation Analysis.

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim or equity interest holders would receive in a chapter 7 liquidation. However, pursuant to section 1112(c) of the Bankruptcy Code, if a debtor is "not a moneyed corporation," a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent. The Debtor, as a non-profit entity, may not be forced to convert its Chapter 11 Case to a chapter 7 case. Thus, conversion to a chapter 7 case is not a viable alternative to the Plan.  Nevertheless, a liquidation analysis is attached to the Plan as **Exhibit A**.  As set forth in the liquidation analysis, if the Plan is not confirmed and the Debtor was forced to liquidate its assets in chapter 7, unsecured creditors would receive approximately 94% of their claims.  As demonstrated in **Exhibit B**, the Plan proposes to a greater distribution percentage and allows the continued operation of the Debtor through the sale process.

### 2.3    Ability to Make Future Plan Payments.

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business.  The Debtor has provided projected financial information in **Exhibit  B**.

### ▮    Article 3: Summary of the Plan

This Plan under chapter 11 of the Bankruptcy Code proposes to pay creditors of the Debtor from cash flow generated from the liquidation of the Debtor's assets.

This Plan provides for:

| | |
|---|---|
| 1 | classes of priority claims; |
| 11 | classes of secured creditors; |
| 1 | classes of non-priority unsecured creditors; |
| 0 | classes of equity security holders. |

On the Effective Date, except as otherwise designated in this Plan, all of the Debtor's assets shall become part of the Liquidating Fund. The Liquidating Agent shall continue to operate the Debtor's business while the Liquidating Agent sells the Debtor's real and personal property. The Plan provides for the payment of all Allowed administrative and priority claims. The Plan further provides for the payment of all Allowed secured claims up to the value of the respective collateral. The Debtor projects sufficient excess sale proceeds to also pay all Allowed unsecured claims in full.

#82203482v4

**YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THESE PAPERS CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY, IF YOU HAVE ONE. (IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.)**

### Article 4: Classification of Claims and Interests

The following table designates the classes of claims against the Debtor and specifies which of those classes are: (a) impaired or unimpaired by the Plan; and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Expenses | N/A | No |
| N/A | Priority Claims | N/A | No |
| 1-A | Secured Claim – Propel | Yes | Yes |
| 1-B | Secured Claim – MHFA | Yes | Yes |
| 1-C | Secured Claim – Hennepin County | Yes | Yes |
| 1-D | Secured Claim – Family Housing | Yes | Yes |
| 1-E | Secured Claim – City Parties | Yes | Yes |
| 1-F | Secured Claim – Bremer | Yes | Yes |
| 1-G | Secured Claim – ProBuild | Yes | Yes |
| 1-H | Secured Claim – Lindstrom | Yes | Yes |
| 1-I | Secured Claim – Huntington | Yes | Yes |
| 1-J | Secured Claim – Yale | Yes | Yes |
| 1-K | Secured Claim – IRS | Yes | Yes |
| 2 | Unsecured Claims | Yes | Yes |

### Article 5: Treatment of Administrative Expense Claims and Priority Tax Claims

Under section 1123(a)(1) of the Bankruptcy Code, Administrative Expense claims and priority tax claims are not in classes and are treated as unclassified claims. Under the Plan, the unclassified claims shall receive the treatment described below:

#### 5.1    Allowed Administrative Expense Claims.

Except as otherwise provided in this Article, holders of Allowed claims specified in section 507(a)(2) of the Bankruptcy Code, shall: (a) be paid in full in cash as soon as reasonably practical following the later of: (i) the Effective Date; (ii) the due date; (iii) the date the claim becomes Allowed, or (iv) the closing of the sales of the Apartment Properties and the Family Center; or (b) receive such other treatment as agreed in writing by the holder thereof or ordered by the Bankruptcy Court.

Professional fees and expenses incurred through the Effective Date and not previously Allowed shall be subject to Court approval after the Effective Date. All holders of professional fees and expenses claims shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than 30 days after the Effective Date. The Liquidating Agent shall pay any Allowed professional fees

#82203482v4

and expenses within 10 days of the later of: (a) the Effective Date; (b) the Court's order allowing such claim, or (c) the closing of the sales of the Apartment Properties and Family Center. For the avoidance of doubt, the professional fees and expenses described in this Article shall include the professional fees and expenses of the subchapter V trustee.

### 5.2    Priority Claims.

The IRS asserts a priority claim of $300 and MNDR asserts a priority claim of $28,135.73. Allowed priority tax claims shall receive a pro rata distribution from the Liquidating Fund after the payment of all Allowed Administrative Expenses as provided in Article 6 of the Plan and all costs of the Liquidating Fund.  Notwithstanding anything to the contrary in this Plan, the holder of an Allowed priority tax claim shall not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with, the Allowed priority tax claim.  Any such claim or demand for any such penalty shall be subject to treatment in Class 2.  The holder of an Allowed priority tax claim shall not assess or attempt to collect such penalty from the Debtor, the Liquidating Fund, the Liquidating Agent, or the property of any of them.

Although the Debtor sought to pay all of its employees in full prior to the Petition Date, including amounts owed for paid time off, certain of the Debtor's employees did not receive full payment for accrued paid time off.  Any Allowed employee priority claims (including the portion of prepetition paid time off entitled to priority under section 507(a)(4) or (5) of the Bankruptcy Code) or other Allowed claims entitled to priority under section 507(a)(4) or (5) of the Bankruptcy Code not already paid shall be paid from the Liquidating Fund on a pro rata basis after the payment of all Allowed Administrative Expenses as provided in Article 5.1 of the Plan and all costs of the Liquidating Fund.

All holders of other Allowed claims not specifically treated in this Article and entitled to priority under section 507(a) of the Bankruptcy Code shall receive a pro rata distribution from the Liquidating Fund after the payment of all Allowed Administrative Expenses as provided in Article 5.1 of the Plan and all costs of the Liquidating Fund.

### 5.3    Statutory Fees.

Court costs and fees payable by the Debtor or the Liquidating Fund under 28 U.S.C. § 1930 shall be paid in full in cash on the Effective Date or as soon as practicable thereafter.

## Article 6: Treatment of Classified Claims and Interest

### 6.1    Class 1-A: Secured Claim – Propel.

Class 1-A consists of the secured claim of Propel, pursuant to a certain loan agreements, which are secured by both a mortgage against the Family Center and a blanket lien on substantially all assets of the Debtor. As of the Petition Date, the Debtor estimates the total amount owed to Propel was approximately $1,288,076.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Family Center for $2,100,000 (ECF No. 68), which is pending before the Court. The sale is scheduled to close no

#82203482v4

later than six months after entry of an order approving the sale. When the sale of the Family Center closes, the Liquidating Agent shall use the net proceeds to pay the full balance of the Allowed Class 1-A claim.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-A claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-A claim pursuant to this Article 6.1 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-A claim. If the Allowed Class 1-A claim is not paid in full after the aforementioned sale, the holder of the Allowed Class 1-A claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.13.

### 6.2    Class 1-B: Secured Claim – MHFA.

Class 1-B consists of the secured claim of MHFA, pursuant to certain loan agreements, which are secured by mortgages and other liens against the Apartment Properties up to the following amounts: $572,635 against the Serenity Property, $500,000 combined against the Journey and Harmony Properties, and $799,555 combined against the Sanctuary and Wisdom Properties. As of the Petition Date, the Debtor estimates the total amount owed to MHFA was approximately $567,680.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. Pursuant to the proposed terms of the sale, the loans, liens, and mortgages of MHFA will be assumed by the buyer and MHFA shall release any and all claims against the Debtor, including the Class 1-B claim. Consequently, the Plan does not provide for any payments to the holder of the Class 1-B claim. Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-B claim as permitted under the Bankruptcy Code or otherwise applicable law.

### 6.3    Class 1-C: Secured Claim – Hennepin County.

Class 1-C consists of the secured claim of Hennepin County, pursuant to certain loan agreements, which are secured by mortgages against the Apartment Properties. As of the Petition Date, the Debtor estimates the total amount owed to Hennepin County was approximately $1,420,000.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. Pursuant to the proposed terms of the sale, the loans, liens, and mortgages of Hennepin County will be assumed by the buyer and Hennepin County shall release any and all claims against the Debtor, including the Class 1-C claim. Consequently, the Plan does not provide for any payments to the holder of the Class 1-C claim. Nothing contained in this Plan shall restrict the Debtor or the

8

Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-C claim as permitted under the Bankruptcy Code or otherwise applicable law.

**6.4      Class 1-D: Secured Claim – Family Housing.**

Class 1-D consists of the secured claim of Family Housing, pursuant to certain loan agreements, which are secured by mortgages against the Journey and Harmony Properties up to $400,000 and mortgages against the Sanctuary and Wisdom Properties up to $150,000. As of the Petition Date, the Debtor estimates the total amount owed to Family Housing was approximately $300,000.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. Pursuant to the proposed terms of the sale, the loans, liens, and mortgages of Family Housing will be assumed by the buyer and Family Housing shall release any and all claims against the Debtor, including the Class 1-D claim. Consequently, the Plan does not provide for any payments to the holder of the Class 1-D claim. Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-D claim as permitted under the Bankruptcy Code or otherwise applicable law.

**6.5      Class 1-E: Secured Claim – City Parties.**

Class 1-E consists of the secured claim of the City Parties, pursuant to a certain loan agreement, which is secured by mortgages against the Sanctuary and Wisdom Properties. As of the Petition Date, the Debtor estimates the total amount owed to the City and UHCD Parties was approximately $100,474.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. Pursuant to the proposed terms of the sale, the loans, liens, and mortgages of City and UHCD Parties will be assumed by the buyer and City and UHCD Parties shall release any and all claims against the Debtor, including the Class 1-E claim. Consequently, the Plan does not provide for any payments to the holder of the Class 1-E claim. Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-E claim as permitted under the Bankruptcy Code or otherwise applicable law.

**6.6      Class 1-F: Secured Claim – Bremer.**

Class 1-F consists of the secured claim of Bremer, pursuant to a certain loan agreement in the aggregate principal amount of $500,000, which is secured by a blanket security interest in substantially all of the Debtor's personal property. As of the Petition Date, the Debtor estimates the total amount owed to Bremer was approximately $507,375.59.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. Pursuant

#82203482v4

to the terms of the proposed sale, the personal property located in the Apartment Properties will also be sold free and clear of Bremer's liens, with such liens attaching to the proceeds allocated to Bremer's collateral.  The Debtor and Liquidating Agent will take an inventory of the personal property prior to the closing of the sale and determine the fair market value of such property.  When the sale of the Apartment Properties closes, the Liquidating Agent shall pay the fair market value of the personal property to the holder of the Allowed Class 1-G claim.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Family Center for $2,100,000 (ECF No. 68), which is pending before the court.  Pursuant to the terms of the proposed sale, the Debtor's personal property located in the Family Center is not included in the sale. However, to the extent the Debtor's personal property located in the Family Center is later included in the sale, the sale of Bremer's Collateral shall be free and clear of Bremer's liens, with such liens attaching to the proceeds allocated to Bremer's collateral, and the Liquidating Agent shall pay the amounts of the sale price allocated to the personal property located in the Family Center to the holder of the Allowed Class 1-F claim.

To the extent any personal property remains after the sale of the Apartment Properties and the Family Center, the Liquidating Agent shall sell or otherwise liquidate the remaining personal property through a sale free and clear of Bremer's liens, with such liens attaching to all net proceeds from the sale of Bremer's collateral, and the Liquidation Agent shall pay all net proceeds to the holder of the Allowed Class 1-F claim.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-F claim as permitted under the Bankruptcy Code or otherwise applicable law.  The payments to the holder of the Class 1-F claim pursuant to this Article 6.6 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-F claim.  If the Allowed Class 1-F claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-F claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

### 6.7    Class 1-G: Secured Claim – ProBuild.

Class 1-G consists of the secured claim of ProBuild, pursuant to a certain mechanic's lien asserted against the Sanctuary and Wisdom Properties in the amount of $7,500.  The Debtor disputes that ProBuild holds a valid claim against the Debtor.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties, including the Sanctuary and Wisdom Properties, for $4,435,000 (ECF No. 70), which is pending before the Court.  The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied.  When the sale of the Apartment Properties closes, to the extent ProBuild holds valid and perfected liens in the Sanctuary and Wisdom Properties, ProBuild's liens shall attach to the proceeds from the sale of the Apartment Properties.  If the Class 1-G claim becomes an Allowed claim, the Liquidating Agent shall use the net proceeds to pay the fill balance of the Allowed Class 1-G claim.

#82203482v4

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-G claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-G claim pursuant to this Article 6.7 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-G claim. If the Allowed Class 1-G claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-G claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

**6.8     Class 1-H: Secured Claim – Lindstrom.**

Class 1-H consists of the secured claim of Lindstrom, pursuant to a certain mechanic's lien asserted against the Journey and Harmony Properties in the amount of $25,589.77. The Debtor disputes that Lindstrom holds a valid claim against the Debtor.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties, including the Journey and Harmony Properties, for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. When the sale of the Apartment Properties closes, to the extent Lindstrom holds valid and perfected liens in the Journey and Harmony Properties, Lindstrom's liens shall attach to the proceeds from the sale of the Apartment Properties. If the Class 1-H claim becomes an Allowed claim, the Liquidation Agent shall use the net proceeds to pay the full balance of the Class 1-H claim.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-H claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-I claim pursuant to this Article 6.8 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-H claim. If the Allowed Class 1-H claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-H claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

**6.9     Class 1-I: Secured Claim – Yale.**

Class 1-I consists of the secured claim of Yale, pursuant to a certain mechanic's lien asserted against the (a) the Journey Property, Harmony Property, and Serenity Property in the amount of $2,401.77 and (b) the Family Center in the amount of $4,233.58, for a total amount of $6,635.35.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. When the sale of the Apartment Properties closes, the Liquidating Agent shall pay $2,401.77 to the holder of the Allowed Class 1-I claim.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Family Center for $2,100,000 (ECF No. 68), which is pending before the court. The sale is scheduled to close no

11

later than six months after entry of an order approving the sale. When the sale of the Family Center closes, the Liquidating Agent shall pay $4,233.58 to the holder of the Allowed Class 1-I claim.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-I claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-J claim pursuant to this Article 6.9 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-I claim. If the Allowed Class 1-I claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-I claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

### 6.10   Class 1-J Secured Claim – Huntington.

Class 1-J consists of the secured claim of Huntington pursuant to a certain loan agreement, which is secured by a lien on one of the Debtor's vehicles. As of the Petition Date, the amount owed to Huntington was approximately $11,597.46.

The Liquidating Agent shall sell the Debtor's vehicle free and clear of Huntington's liens, claims, and interests and such liens, claims, and interests shall attach to the sale proceeds. After the sale of the vehicle, the Liquidating Agent shall use the net proceeds to pay the balance of the Class 1-J claim.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-J claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-J claim pursuant to this Article 6.10 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-J claim. If the Allowed Class 1-J claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-J claim shall be entitled to an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

### 6.11   Class 1-K Secured Claim – IRS.

Class 1-K consists of the claim of the IRS in the amount of $1,212,208.15. The IRS alleges that $1,204,541.96 is secured by all assets of the Debtor, including the Family Center and the Apartment Properties, through a federal tax lien. However, the IRS only registered a tax lien against the Family Center, in the amount of $295,336.61, and did not register any other tax liens against the Family Center or the Apartment Properties. The Debtor disputes that the IRS holds a secured claim in any amount over $295,336.61.

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Family Center for $2,100,000 (ECF No. 68), which is pending before the court. The sale is scheduled to close no later than six months after entry of an order approving the sale. When the sale of the Family Center closes, the Liquidating Agent shall pay $295,336.61 to the holder of the Allowed Class 1-K claim.

#82203482v4

On June 18, 2024, the Debtor filed a motion seeking authority to sell the Apartment Properties for $4,435,000 (ECF No. 70), which is pending before the Court. The sale is scheduled to close on or around September 3, 2024, after certain closing conditions are satisfied. When the sale of the Apartment Properties closes, to the extent the IRS holds valid and perfected liens in the Apartment Properties, the IRS's liens shall attach to the proceeds from the sale of the Apartment Properties.

If it is determined that the IRS holds valid liens against the Family Center or the Apartment Properties, the Liquidating Agent shall use the net proceeds from the sales of the Family Center and the Apartment Properties to pay the full balance of the Allowed Class 1-K claim. Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid the Class 1-K claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 1-K claim pursuant to this Article 6.11 of the Plan shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Allowed Class 1-K claim. If the Allowed Class 1-K claim is not paid in full after the aforementioned sales, the holder of the Allowed Class 1-K claim shall be entitled to either an Allowed claim and a distribution under Article 5.2 of the Plan or an Allowed Class 2 claim and a pro rata distribution from the Liquidating Fund as more fully described in Article 6.12.

### 6.12    Class 2: Unsecured Claims.

Class 2 consists of the general unsecured claims. Except to the extent that a holder of a general unsecured claim: (a) has been paid by the Debtor prior to the Effective Date; or (b) agrees to a less favorable classification and treatment, each holder of an Allowed general unsecured claim shall receive a pro rata distribution from the Liquidating Fund after the payment of all Allowed Administrative Expenses as provided in Article 5.1 of this Plan, Allowed priority claims as provided in Article 5.2 of this Plan, statutory fees as provided in Article 5.3 of this Plan, Allowed Class 1 secured claims as provided in Articles 6.1-6.12 of this Plan, and all costs and expenses of the Liquidating Fund. General unsecured claims shall include claims by counterparties to executory contracts and unexpired leases that are rejected pursuant to Article 8 of this Plan and shall also include the balance of any Allowed Class 1 secured claim under Articles 6.1-6.12 of this Plan that remains unpaid after the conclusion of the liquidation of all collateral.

Nothing contained in this Plan shall restrict the Debtor or the Liquidating Agent from objecting to, contesting, or seeking to avoid a Class 2 claim as permitted under the Bankruptcy Code or otherwise applicable law. The payments to the holder of the Class 2 claims pursuant to this Article 6.13 shall be in exchange for, and in full satisfaction, settlement, release, and discharge of, the Class 2 claims.

### Article 7: Distributions and Claims Administration

### 7.1    Payments under the Plan.

Unless otherwise provided in the Plan, the Liquidating Agent shall make a final distribution after determining, in consultation with the Oversight Committee, that all assets that feasibly could be liquidated have been liquidated. At its discretion, but in consultation with the Oversight

#82203482v4

Committee, the Liquidating Agent may make, but is not required to make, an initial distribution and additional distributions before the final distribution.

Payments under this Plan shall be made by check (mailed with first class postage pre-paid), ACH, or wire transfer to the holder of each Allowed claim.  If made by check, payments shall be mailed to the claim holder at the address listed on its proof of claim as of the Confirmation Date, or if no proof of claim has been filed by the Confirmation Date, to the address listed on the Schedules as of the Confirmation Date.  If made by ACH or wire transfer, payments shall be made to the claim holder using the bank account or other routing information provided by the claim holder to the Debtor or the Liquidating Agent.  Holders of Allowed claims as of the Confirmation Date may contact counsel for the Liquidating Agent to amend their addresses or bank account information at:

Fredrikson & Byron, P.A.
Attention: Steven R. Kinsella
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
skinsella@fredlaw.com

The Liquidating Agent may also be contacted at:

STL Consulting, Inc.
Attn: William Hansen
whansen@perspectives-family.org

**7.2    Delay of Distribution on Contested Claims.**

No distribution will be made on account of a Contested Claim unless such claim is Allowed by a final non-appealable order.

**7.3    Settlement of Contested Claims.**

The Debtor will have the power and authority to settle and compromise a Contested Claim with court approval and compliance with Bankruptcy Rule 9019.

**7.4    Unclaimed Payments and Excess Proceeds.**

In the event a payment is returned to the Liquidating Agent unclaimed, with no indication of the payee's forwarding address, the Liquidating Agent shall hold such payment for a period of 90 days from the date of return.  If not claimed by the payee by the end of that period, the payment shall become property of the Liquidating Fund.  In the event there are unclaimed funds at the end of the distribution process and redistribution to other holders of Allowed claims is impractical or in the event that the Liquidating Fund holds excess proceeds after all Allowed claims are paid in full, the Liquidating Agent shall pay over such funds on a pro rata basis to: (a) Trellis Co., a 501(c)(3) nonprofit organization, for the support of its program to provide low-income housing to the same population previously served by the Debtor, but only if the sale of the Apartment Properties to Trellis Co. closes; and (b) Missions, Inc., a 501(c)(3) nonprofit organization that

14

often works with Trellis Co., for the support of its program to provide chemical health, domestic violence, and long-term care services to the same population previously served by the Debtor, but only if the sale of the Apartment Properties to Trellis Co. closes.

## Article 8: Executory Contracts and Unexpired Leases

Each Assumed Agreement shall be assumed as of the Effective Date. All other executory contracts, unexpired leases, or other agreements that are not Assumed Agreements and were not previously assumed or rejected by order of the Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all such executory contracts, unexpired leases, and other agreements. The Debtor reserves the right to alter, amend, remove from, or add to the list of Assumed Agreements at any time prior to the Confirmation Date.

The Debtor proposed cure amounts for each Assumed Agreement and listed those proposed cure amounts on **Exhibit C**. Unless an objection is filed prior to entry of the Confirmation Order, then such amount shown on **Exhibit C** as "cure" shall be conclusively determined to be the amount required to cure any monetary or non-monetary default under any assumed executory contract or unexpired lease. Payments of any cure amount claims relating to the Assumed Agreements shall be made within 30 days of the Effective Date, unless the parties otherwise agree to different payment terms.

To the extent not subject to a claim filing deadline set forth in any prior or subsequent notice or order, claims arising out of the rejection of an executory contracts or unexpired lease pursuant to this Article of the Plan must be filed with the Court within 30 days after the entry of the Confirmation Order and, upon allowance, shall be paid pursuant to Article 6.12 of the Plan.

## Article 9: Means of Implementation

### 9.1    Liquidating Fund.

On the Effective Date, except as otherwise designated in this Plan, all of the Debtor's assets shall become part of the Liquidating Fund, which shall be used for the administrative costs of administrating the Plan and for payments to holders of Allowed claims in accordance with the terms of this Plan under the direction of the Liquidating Agent. The transfer of assets and rights to the Liquidating Fund shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Fund as if the asset or right was still held by the Debtor. As an integral part of implementation of the Plan, the Liquidating Agent shall sell or otherwise liquidate or abandon all remaining assets to fund administration of the Liquidating Fund for the benefit of the holders of Allowed claims.

### 9.2    Liquidating Agent.

STL Consulting, Inc. shall be appointed the initial Liquidating Agent. The Liquidating Agent's primary tasks are to receive the Liquidating Fund, liquidate assets, pursue causes of action, administer claims, and distribute proceeds for the benefit of the holders of Allowed claims. The Debtor expressly preserves avoidance claims. The Liquidating Agent shall file a motion,

#82203482v4

application, or other request to close the Chapter 11 Case when the case has been fully administered.

In furtherance of and consistent with the purpose of the Plan, and subject to the direction and consent of the Oversight Committee, in addition to the powers and authority specifically provided elsewhere in the Plan, the Liquidating Agent shall receive the Liquidating Fund, have the powers of an agent to act for the holders of Allowed claims under the Plan on account of such claims and be a "representative of the estate" as set forth in section 1123(b)(3)(B) of the Bankruptcy Code together with the power and authority to: (a) hold, manage, or sell the assets of the bankruptcy estate; (b) effect all actions and execute all agreements, instruments, and other documents necessary to implement the provisions of this Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer any asset on behalf of the Debtor and the Liquidating Fund; (c) establish reserves for Contested Claims, taxes, assessments, professional fees, and other expenses of administration of the Liquidating Fund as may be necessary and appropriate for the operation of the Liquidating Fund; (d) calculate and make distributions from the Liquidating Fund to the holders of all Allowed claims in accordance with the provisions of this Plan; (e) investigate, prosecute, litigate, settle, or compromise any objections to claims, avoidance claims, and causes of action on behalf of the Debtor; (f) review, reconcile, or object to claims and resolve such objections as set forth in this Plan; (g) object to the amount of any claim on the Debtor's Schedules if the Liquidating Agent determines in good faith that the claim is invalid, has previously been paid or satisfied, or other grounds exist for an objection; (h) defend, protect, and enforce any and all rights and interests transferred to the Liquidating Fund or Liquidating Agent; (i) retain professionals and incur any reasonable and necessary expenses in performance of its duties and pay those expenses without any further application to the Court but shall be subject to the consent of the Oversight Committee; (j) pay any and all claims, liabilities, losses, damages, costs, and expenses incurred by the Liquidating Agent, including all fees and expenses of the Liquidating Agent and professionals retained by the Liquidating Agent; (k) file estate or other tax returns; (l) operate assets for periods reasonably required to preserve or maximize value pending liquidation and distribution to holders of Allowed claims; (m) open, create, or close accounts to deposit, hold, and disburse funds; (n) invest cash in demand or time deposits to obtain market rates of return pending distributions; (o) file any and all reports and motions or requests for relief with the Court any opposition thereto; (p) extend, renew, enter into, authorize, and benefit from any insurance policies, including, but not limited to, tail coverage for insurance policies in place on the Petition Date and rights of indemnification; (q) dissolve the Debtor or otherwise wind up and of the Debtor's corporate affairs and existence; (r) subject to approval of the Oversight Committee, incur indebtedness to fund administration of the Plan; (s) perform any other functions that are necessary to effectuate this Plan and perform its duties as Liquidating Agent; (t) have the power and authority to administer the closure of the Chapter 11 Case; and (u) if and to the extent required to effectuate any action necessary in the performance of the Plan or wind up of the Debtor's corporate affairs and existence. In all circumstances, the Liquidating Agent shall act in the best interests of the holders of Allowed claims.

The Liquidating Agent shall be entitled to be paid reasonable compensation and expenses from the Liquidating Fund, subject to the consent of the Oversight Committee. The Liquidating Agent shall be entitled to retain professionals without Court approval, but with consent of the Oversight Committee to assist in its duties, and shall be entitled to pay such professionals

16

reasonable compensation and expenses, subject to the consent of the Oversight Committee.  The Liquidating Agent may hire former employees and other "insiders" (as that term is defined in the Bankruptcy Code) of the Debtor for postconfirmation services, and may pay such individuals reasonable compensation and expenses, subject to the consent of the Oversight Committee.

At any time upon 30 days' written notice to the Liquidating Agent and upon a unanimous vote by the members of the Oversight Committee, the Oversight Committee may move the Court for an order removing the Liquidating Agent and appointing a successor Liquidating Agent.  The motion shall identify a proposed successor Liquidating Agent and generally describe the qualifications of the person to act as successor Liquidating Agent.  The Court shall grant the motion if all members vote in favor of the removal and cause exists for the removal of the Liquidating Agent.

### 9.3    Oversight Committee.

The Oversight Committee shall consist initially of four members: Susan Grafton, James Kremer, Patricia Weller, and Dawn Courrier.  The Oversight Committee may act with as few as two members.  In the event that a resignation or termination of members of the Oversight Committee reduces the number of members to less than two members, then one successor member shall be appointed by the remaining member and the Liquidating Agent.  The Oversight Committee shall monitor the Liquidating Agent and all activities set forth in this Plan.  The Oversight Committee shall have the power and authority to ratify or reject decisions of the Liquidating Agent, and, in its discretion, the Oversight Committee may delegate to the Liquidating Agent such power and authority as it deems proper.  The members of the Oversight Committee shall not be paid for serving on the Oversight Committee except for reimbursement of actual expenses incurred by such members.  The Oversight Committee shall be governed by bylaws substantially in the form of those attached as **Exhibit D**.  In the event that a vote by the Oversight Committee results in a tie vote, the Liquidating Agent (although not a member) shall be entitled to vote on that issue as set forth in **Exhibit D**.

### 9.4    Liability and Indemnification of Liquidating Agent and Oversight Committee.

The Liquidating Agent, Oversight Committee members, or their respective designees, employees, professionals, or agents shall not be liable for the act or omission of any other designee, employee, professional, or agent.  The Liquidating Agent and the Oversight Committee members shall not be liable for any act or omission taken in their respective capacities, other than acts or omissions resulting from willful misconduct, gross negligence, or fraud.  The Liquidating Agent, Oversight Committee members, and their designees, employees, professionals, or agents shall be indemnified and held harmless, including the cost of defending such claims and the attorney fees in seeking indemnification, by the Liquidating Fund against any and all claims arising out of their duties under this Plan, except to the extent their actions constitute willful misconduct, gross negligence, or fraud.

### 9.5    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes; Cancellation of Instruments.

#82203482v4

The Debtor and the Liquidating Agent, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer real property on behalf of the Debtor and the Liquidating Fund. Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, or similar tax: (a) the creation of any mortgage, deed of trust, lien, or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to this Plan.

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtor, except such instruments that are authorized or issued under this Plan, shall be cancelled and extinguished. The holders of, or parties to, the cancelled notes and other agreements and instruments shall have no rights arising from or relating to such notes and other agreements and instruments or the cancellation thereof, except any rights provided pursuant to this Plan.

## Article 10: Effect of Confirmation of the Plan

### 10.1    Title to and Vesting of Assets.

All property of the Debtor and the estate is dealt with by this Plan; therefore, on the Effective Date, to the full extent authorized by section 1141(b) of the Bankruptcy Code, all property of the Debtor and the estate vests in the Liquidating Fund and such property is free and clear of all liens, encumbrances, claims, and interests of creditors, including any notices of *lis pendens*, except to the extent the Plan explicitly provides that such liens, encumbrances, claims, or interests are retained. From and after the Effective Date, the Liquidating Agent may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in this Plan.

### 10.2    Discharge.

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the Effective Date, the Debtor will be discharged from all claims that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(a) imposed by this Plan; or

(b) to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

#82203482v4

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any claim provided for in this Plan until the Court grants a discharge on completion of all payments due within the first five years of this Plan, or otherwise provided in section 1192 of the Bankruptcy Code. The Debtor will not be discharged from any debt:

(a)  on which the last payment is due after the first five years of the Plan, or as otherwise provided in section 1192 of the Bankruptcy Code; or

(b) excepted from discharge under section 523(a) of the Bankruptcy Code, except as provided in Bankruptcy Rule 4007(c)

A discharge under this Plan discharges, waives, and releases the Debtor from any debt or claim that arose before the Effective Date and any debt of a kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, regardless of whether or not: (a) a proof of claim was filed or deemed filed under section 501 of the Bankruptcy Code; (b) such claim is Allowed under section 502 of the Bankruptcy Code; or (c) the holder of such claim has accepted the Plan.  The payments of, distributions on account of, or treatments of claims in this Plan are deemed to satisfy in full all claims.

## Article 11: General Provisions

### 11.1    Effective Date.

The Effective Date of this Plan is the first business day following the date that is 14 days after the entry of the Confirmation Order.  If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

### 11.2    Modification of the Plan.

Subject to the restrictions on alteration, amendment, and modification set forth in section 1127 of the Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify this Plan before the Effective Date, including at any hearings on confirmation as are necessary to permit this Plan to be confirmed under section 1129(b) of the Bankruptcy Code.

### 11.3    Revocation of the Plan.

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws this Plan, or if the Court does not confirm the Plan, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall: (a) constitute a waiver or release of any claims by or against the Debtor; (b) prejudice in any manner the rights of the Debtor or any other party in interest; or (c) constitute an admission of any sort by the Debtor or any other party in interest.

#82203482v4

**11.4    Default.**

Unless otherwise provided elsewhere in the Plan, default with respect to the Liquidating Fund's obligations to any holder of Allowed claim under the Plan shall not occur unless and until such holder has delivered written notice of such default to the Liquidating Fund and the Liquidating Fund has failed to cure such default within 30 days after receipt of such written notice.  If the Liquidating Fund fails to cure a default, the sole remedy is a claim for breach of contract.

**11.5    Severability.**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**11.6    Binding Effect.**

The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

**11.7    Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**11.8    Controlling Effect.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Bankruptcy Rules), the laws of the State of Minnesota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**[SIGNATURE PAGE TO FOLLOW]**

#82203482v4

IN WITNESS WHEREOF, the undersigned has executed this Plan of Liquidation for Small Business under Chapter 11 as of June 25, 2024.

**PERSPECTIVES, INC.**

By: Susan Grafton
Its: Chair of Board of Directors

/e/ Steven R. Kinsella

Steven R. Kinsella (#0392289)
Katherine A. Nixon (#0402772)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
Phone: (612) 492-7000
skinsella@fredlaw.com
knixon@fredlaw.com

**ATTORNEYS FOR DEBTOR**

21

#82203482v4

**PERSPECTIVES, INC.**
**CASE NO. 24-40832**

**EXHIBIT A – LIQUIDATION ANALYSIS**

**Liquidation Analysis**
**Perspectives, Inc.**
**Dated: June 25, 2024**

| Assets | | |
|---|---|---|
| **Real Property** | | |
| Est. Family Center Equity | $ | 269,478.52 |
| Est. Apartment Properties Equity | $ | 1,695,254.46 |
| **Total Real Property Equity** | **$** | **1,964,732.98** |
| | | |
| **Cash** | | |
| Value (projected as of August 26, 2024) | $ | 163,447.00 |
| Less Bremer Secured Claim | $ | (163,447.00) |
| **Total Remaining Cash** | **$** | **-** |
| | | |
| **Equipment** | | |
| Value | $ | 21,206.81 |
| Less Bremer Secured Claim | $ | (21,206.81) |
| **Total Equipment Equity** | **$** | **-** |
| | | |
| **Remaining Personal Property** | | |
| Value | $ | 10,000.00 |
| Less Bremer Secured Claim | $ | (10,000.00) |
| **Total Personal Property Equity** | **$** | **-** |
| | | |
| **Accounts Receivable** | | |
| Value | $ | - |
| Less Bremer Secured Claim | $ | - |
| **Total AR Equity** | **$** | **-** |
| | | |
| **Unsecured Creditor Waterfall** | | |
| | | |
| **Total Distributable Assets** | **$** | **1,964,732.98** |
| | | |
| **Administrative Claims** | | |
| Chapter 11 Administrative Expenses | $ | (120,000.00) |
| Chapter 7 Trustee Fees | $ | (82,191.99) |
| Chapter 7 Administrative Expenses | $ | (160,000.00) |
| **Total Administrative Claims** | **$** | **(362,191.99)** |
| | | |
| **Unsecured Priority Claims** | | |
| IRS | $ | (633,488.19) |
| MNDR | $ | (37,010.25) |
| Employee PTO | $ | - |
| **Total Priority Claims** | **$** | **(670,498.44)** |
| | | |
| **Total Distribution to General Unsecured Creditors** | **$** | **932,042.55** |
| | | |
| **Unsecured Claims** | | |
| Bremer Bank Deficiency Claim | $ | (312,722.08) |
| IRS Penalties | $ | (283,383.35) |
| Unsecured Claims | $ | (394,777.81) |
| **Subtotal** | **$** | **(990,883.24)** |
| | | |
| **Percentage Recovery for Unsecured Claims** | | **94%** |

**PERSPECTIVES, INC.**
**CASE NO. 24-40832**

**EXHIBIT B – CASH FLOW PROJECTIONS**

**Cash Flow Projections**
Perspectives, Inc.
Dated: June 25, 2024

| | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Total |
|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | $ 168,068.00 | $ 153,922.23 | $ 748,511.64 | $ 721,161.64 | $ 692,811.64 | $ 1,229,276.77 | $ - | |
| | | | | | | | | |
| **Projected Revenue** | | | | | | | | |
| Hennepin County - SHP | $ 27,500.00 | $ 27,500.00 | $ - | $ - | $ - | $ - | $ - | $ 55,000.00 |
| MN-DHS-THP-WRS (WIR) - Hand in Hand | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MN-DHS-THP-OEO | $ 6,250.00 | $ 6,250.00 | $ - | $ - | $ - | $ - | $ - | $ - |
| HC - THP Case Management - Behavioral Health | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| HUD Supportive Housing Grant | $ 9,833.00 | $ 9,833.00 | $ - | $ - | $ - | $ - | $ - | $ - |
| HUD Section 8 St. Louis Park | $ 19,000.00 | $ 19,000.00 | $ - | $ - | $ - | $ - | $ - | $ 38,000.00 |
| The Block Rent (Parking Lot) | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ - | $ - | $ 7,500.00 |
| Rent MN Dept. Human Services | $ 128.00 | $ 128.00 | $ - | $ - | $ - | $ - | $ - | $ 256.00 |
| Rent Residents | $ 1,000.00 | $ 1,000.00 | $ - | $ - | $ - | $ - | $ - | $ 2,000.00 |
| Apartment Properties Sale Proceeds | $ - | $ 2,046,846.00 | $ - | $ - | $ - | $ - | $ - | $ 2,046,846.00 |
| Family Center Sale Proceeds | $ - | $ - | $ - | $ - | $ 1,935,340.00 | $ - | $ - | $ 1,935,340.00 |
| Sale of Van | $ 20,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 20,000.00 |
| Other | $ - | $ - | $ 10,000.00 | $ - | $ - | $ - | $ - | $ 10,000.00 |
| | | | | | | | | |
| **Total Projected Revenue** | $ 85,211.00 | $ 2,112,057.00 | $ 11,500.00 | $ 1,500.00 | $ 1,936,840.00 | $ - | $ - | $ 4,147,108.00 |
| | | | | | | | | |
| **Projected Expenses** | | | | | | | | |
| Payroll - Net Pay and Payroll Taxes | $ (28,604.00) | $ (14,302.00) | $ - | $ - | $ - | $ - | $ - | $ (42,906.00) |
| STL Consulting | $ (9,600.00) | $ (9,600.00) | $ (9,600.00) | $ (9,600.00) | $ (9,600.00) | $ (9,600.00) | $ - | $ (57,600.00) |
| Mighty Consulting | $ (3,000.00) | $ (1,500.00) | $ - | $ - | $ - | $ - | $ - | $ (4,500.00) |
| Medica | $ (2,575.00) | $ (2,575.00) | $ - | $ - | $ - | $ - | $ - | $ (5,150.00) |
| Commercial Insurance | $ (8,453.00) | $ (8,453.00) | $ (2,500.00) | $ (2,500.00) | $ (2,500.00) | $ - | $ - | $ (24,406.00) |
| Work Comp Insurance SFM | $ (453.00) | $ (453.00) | $ - | $ - | $ - | $ - | $ - | $ (906.00) |
| Unemployment Trust | $ (2,900.00) | $ (2,900.00) | $ - | $ - | $ - | $ - | $ - | $ (5,800.00) |
| Aspen Waste | $ (2,500.00) | $ (2,500.00) | $ - | $ - | $ - | $ - | $ - | $ (5,000.00) |
| Xcel | $ (3,000.00) | $ (3,000.00) | $ - | $ - | $ - | $ - | $ - | $ (6,000.00) |
| Sage | $ (520.00) | $ (520.00) | $ - | $ - | $ - | $ - | $ - | $ (1,040.00) |
| Comcast | $ (1,346.00) | $ (673.00) | $ - | $ - | $ - | $ - | $ - | $ (2,019.00) |
| Verizon | $ (165.00) | $ (165.00) | $ - | $ - | $ - | $ - | $ - | $ (330.00) |
| SLP Utilities | $ (6,900.00) | $ (6,900.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ - | $ - | $ (16,800.00) |
| Delta Dental | $ (250.00) | $ (250.00) | $ - | $ - | $ - | $ - | $ - | $ (500.00) |
| Center Point Energy | $ (5,000.00) | $ (5,000.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ - | $ - | $ (13,000.00) |
| Lawn Care/Snow Removal | $ (2,500.00) | $ (1,250.00) | $ (750.00) | $ (750.00) | $ (750.00) | $ - | $ - | $ (6,000.00) |
| Liquidating Agent's Professionals | $ - | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ (10,000.00) | $ - | $ (50,000.00) |
| Property Sale Closing Costs | $ - | $ (291,100.00) | $ - | $ - | $ (151,000.00) | $ - | $ - | $ (442,100.00) |
| Miscellaneous | $ (4,000.00) | $ (4,000.00) | $ (4,000.00) | $ (4,000.00) | $ (4,000.00) | $ (4,000.00) | $ - | $ (24,000.00) |
| | | | | | | | | |
| **Total Projected Expenses** | $ (81,766.00) | $ (365,141.00) | $ (28,850.00) | $ (28,850.00) | $ (179,850.00) | $ (23,600.00) | $ - | $ (708,057.00) |
| | | | | | | | | |
| **Projected Plan Payments** | | | | | | | | |
| Administrative Expense - Debtor's Counsel | $ - | $ (120,000.00) | $ - | $ - | $ - | $ - | $ - | $ (120,000.00) |
| Administrative Expense - Subchapter V Trustee | $ (5,000.00) | $ (5,000.00) | $ - | $ - | $ - | $ - | $ - | $ (10,000.00) |
| Administrative Expense - Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority - Tax Claims | $ - | $ (670,498.44) | $ - | $ - | $ - | $ - | $ - | $ (670,498.44) |
| Priority - Employee Claims | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Priority - Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-A - Propel | $ - | $ - | $ - | $ - | $ (1,215,291.29) | $ - | $ - | $ (1,215,291.29) |
| Class 1-B - MHFA | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-C - Hennepin County | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-D - Family Housing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-E - HCHR | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-F - UHCD | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Class 1-G - Bremer | $ (1,000.00) | $ (26,000.00) | $ (10,000.00) | $ (1,000.00) | $ (1,000.00) | $ (458,375.89) | $ - | $ (497,375.89) |
| Class 1-H - ProBuild | $ - | $ (7,500.00) | $ - | $ - | $ - | $ - | $ - | $ (7,500.00) |
| Class 1-I - Huntington | $ (11,590.77) | $ - | $ - | $ - | $ - | $ - | $ - | $ (11,590.77) |
| Class 1-J - Lindstrom | $ - | $ (25,589.77) | $ - | $ - | $ - | $ - | $ - | $ (25,589.77) |
| Class 1-K - Yale | $ - | $ (2,401.77) | $ - | $ - | $ (4,233.58) | $ - | $ - | $ (6,635.35) |
| Class 1-L - IRS | $ - | $ (295,336.61) | $ - | $ - | $ - | $ (283,383.35) | $ - | $ (578,719.96) |
| Class 2 - Unsecured Claims | $ - | $ - | $ - | $ - | $ - | $ (394,777.81) | $ - | $ (394,777.81) |
| Class 2 - Interest | $ - | $ - | $ - | $ - | $ - | $ (3,474.81) | $ - | $ (3,474.81) |
| Remainder Charitable Contribution | $ - | $ - | $ - | $ - | $ - | $ (65,664.91) | $ - | $ (65,664.91) |
| | | | | | | | | |
| **Total Projected Plan Payments** | $ (17,590.77) | $ (1,152,326.59) | $ (10,000.00) | $ (1,000.00) | $ (1,220,524.87) | $ (1,205,676.77) | $ - | $ (3,607,119.00) |
| | | | | | | | | |
| **Ending Cash Balance** | $ 153,922.23 | $ 748,511.64 | $ 721,161.64 | $ 692,811.64 | $ 1,229,276.77 | $ - | $ - | |

**PERSPECTIVES, INC.**
**CASE NO. 24-40832**

**EXHIBIT C – LIST OF ASSUMED AGREEMENTS**

None.

**PERSPECTIVES, INC.**
**CASE NO. 24-40832**

**EXHIBIT D – OVERSIGHT COMMITTEE BYLAWS**

**BYLAWS OF THE OVERSIGHT COMMITTEE**
**IN RE PERSPECTIVES, INC.**
**Case No. 24-40832**

## I.    THE OVERSIGHT COMMITTEE.

1.1    <u>Appointment of Committee.</u> On March 28, 2024, Perspectives, Inc. (the "<u>Debtor</u>"), filed a case under subchapter V of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") that is currently pending before the United States Bankruptcy Court for the District of Minnesota ("<u>Bankruptcy Court</u>"). Pursuant to the Debtor's Chapter 11 Plan of Liquidation dated June 25, 2024 (the "<u>Plan</u>"), and confirmed on August __, 2024, all estate assets became part of the Liquidating Fund,[1] which shall be used to liquidate remaining estate assets and distribute the proceeds according to the terms of the Plan under the direction of the Liquidating Agent. Under Section 9.3 of the Plan, this "<u>Oversight Committee</u>" was appointed to undertake the powers and duties granted to it as set forth in the Plan, including monitoring the Liquidating Agent and the activities set forth in the Plan.

1.2    <u>Membership.</u> The Oversight Committee is composed of the Members identified in Section 9.3 of the Plan. The members of the Committee are referred to individually herein as a "<u>Member</u>" and collectively as the "<u>Members</u>." The functions of the Oversight Committee are set forth in the Plan.

1.3    <u>Chairperson.</u> The Committee will select its chairperson ("<u>Chairperson</u>") at its first meeting. In the event the Chairperson resigns or for any other reason is unable to serve, the majority of the Members entitled to vote shall choose a successor.  Additionally, such a majority may at any time, with or without cause, replace the Chairperson at: (a) a meeting called with at least three days' advance written notice, or (b) a meeting attended by all Members.

1.4    <u>Other Professional Persons.</u> Pursuant to Section 9.2 of the Plan, STL Consulting, Inc. was appointed to serve as the initial Liquidating Agent.  The Liquidating Agent is entitled to retain professionals to assist in its duties and to pay such professionals' reasonable compensation and expenses, subject to the consent of the Oversight Committee. Through execution of these Bylaws, the Oversight Committee consents to the Liquidating Agent's retention of the law firm of Fredrikson & Byron, P.A. to serve as the Liquidating Agent's general bankruptcy counsel ("<u>Counsel</u>") and consents to the payment of Counsel's compensation and expenses after review by the Liquidating Agent.

1.5    <u>Resignation.</u>  A Member may resign at any time by giving written notice thereof to the Liquidating Agent and a copy to Counsel.

1.6    <u>Removal.</u>   Upon receiving a recommendation from the Liquidating Agent, a Member, or Counsel, the Oversight Committee may elect to remove a Member under the following circumstances: (a) for a breach of any of his or her fiduciary duties as a Member; or (b) for conduct

---

[1] All capitalized terms not otherwise defined in these Bylaws shall have the same meaning ascribed to them in the Plan.

that would warrant removal of a member of any committee by the United States Trustee or the Bankruptcy Court pursuant to 11 U.S.C. §§ 1102-1103.  A Member may be removed by the affirmative vote of not less than two-thirds of the Members entitled to vote on such matters.

1.7    Replacement Members. In the event of the resignation or removal of any Member of the Oversight Committee, the Oversight Committee shall perform all of its functions with its reduced number (disregarding such vacancy for purposes of determining a majority). The Oversight Committee may act with as few as two members. If the resignation or removal reduces the number of members to less than two members, then one successor Member shall be appointed by the remaining Member and the Liquidating Agent.

## II.    MEETINGS AND ACTION BY THE COMMITTEE.

2.1    Calling and Notice. Meetings of the Oversight Committee may be called by the Chairperson, the Liquidating Agent, or by Counsel, and shall be called by Counsel, the Liquidating Agent, or the Chairperson upon the request of two of the voting Members. Notice of the time and place of each meeting of the Oversight Committee shall be given to each Member and its counsel no less than two business days in advance of such meeting except when such notice is impractical or unreasonable due to exigent circumstances. No notice of an adjourned meeting need be given, other than by announcement at the meeting at which the adjournment is taken and by reasonable notice (under the circumstances) to any Members and their counsel who were not present at such meeting. The Oversight Committee shall endeavor, whenever feasible, to determine at each meeting when the next meeting shall be held. If feasible, each notice of a meeting shall be in writing; if not, notice may be given orally, by telephone or otherwise.

2.2    Place of Meetings; Meetings by Conference Call. Meetings of the Oversight Committee shall be held at such place as designated by the Oversight Committee.  Meetings shall be held in person, by conference call, or by a virtual meeting service.

2.3    Meeting Agenda. The agenda for regularly scheduled meetings shall be prepared by Counsel. Any Member or the Liquidating Agent may supplement the Agenda by circulating additional items by email to all other Members, the Liquidating Agent, and Counsel. If feasible, a proposed agenda will be circulated to each Member, the Liquidating Agent, and Counsel at least one business day in advance of each Oversight Committee meeting.

2.4    Quorum. A majority of all voting Members shall constitute a quorum for the transaction of business at any meeting. A quorum shall include Members attending in person, by Proxy (with respect to any Oversight Committee votes within the scope of such Proxy), and by telephone or video connection as long as such connection is sufficient for all attending Members to hear each other attending Member (in each such case, such Member deemed to be "Present").

2.5    Voting; Polling by Telephone. Each voting Member shall be entitled to one vote, and may attend and vote (a) in person, or (b) through a designated alternate.  Subject to Section 2.7, all issues to be voted on shall be decided by a simple majority of those present at the meeting in which the vote takes place. Each Member shall have the right to authorize any other Member to cast the Member's vote for them ("Voting by Proxy") in the event that the Member is not able to

attend or participate by telephone in a meeting. Action of the Oversight Committee shall be authorized by the vote of a majority of the Members Present at the time of the vote if there is a quorum. A Member who abstains shall be counted as voting. A Member recused from voting under Section 2.7 shall not be counted as voting. In the event that a vote by the Oversight Committee results in a tie vote on an issue other than a vote under Section 2.7(b), the Liquidating Agent (although not a Member) shall be entitled to vote on that issue. The designation of alternates at meetings may be in such form, written or oral, as may be acceptable to the Chairperson, upon advice of Counsel. If the matter to be voted on is one of significance and urgency, as determined by a majority of the Members Present, with the advice of Counsel, a reasonable effort shall be made during the meeting to poll by telephone or email all absent Members, provided that the failure to reach any such absent Member will not affect the validity of any vote otherwise proper under these Bylaws. Telephone or email votes solicited pursuant to this section, along with votes by Proxy, shall be given full voting effect, and may be counted in computing a quorum in respect of the relevant action. Attendance at meetings of the Oversight Committee shall be limited to Members, their respective counsel, the Liquidating Agent, professionals or agents employed or retained by the Oversight Committee, and other persons invited by the Oversight Committee for special or limited purposes.

2.6    Action Without Meeting. Any action required or permitted to be taken by the Oversight Committee, or any subcommittee, may be taken without a meeting provided that a reasonable effort is made to contact each Member or subcommittee member for its vote and to notify each ex officio member of the pendency of such action, and the action voted on is approved by no less than a majority of the entire Oversight Committee or subcommittee then acting as such. Such polling shall be conducted by the Chairperson or by Counsel acting upon the direction of the Chairperson, or by the chairperson of a subcommittee. Any action taken pursuant to this section shall be memorialized in writing and filed with the minutes of the Oversight Committee or subcommittee, as the case may be.

2.7    Conflicts of Interest. In the event that any matter under review or consideration by the Oversight Committee may involve a conflict of interest with respect to any Member, such Member shall disclose such potential conflict of which he or she has knowledge, shall be removed from voting on the matter voluntarily or, if determined by the Oversight Committee to involve a conflict of interest, may be excluded by vote of a majority of the Members then Present and not subject to such conflict of interest from that portion of the meeting at which such matter is considered.

(a) A Member shall be deemed to have an irrebuttable conflict in matters concerning: (i) any potential or actual Causes of Action (as that term is defined in the Plan) asserted against the Member or an entity related to the Member; and (ii) any potential or actual Contested Claim (as that term is defined in the Plan) involving a claim asserted by the Member or an entity related to the Member.

(b) Counsel shall make a determination as to whether a Member should be excluded from a meeting or any portion thereof and shall submit a recommendation to the Oversight Committee in respect of each potential conflict unless the Member voluntarily abstains from voting or otherwise participates in the consideration of the matter giving rise to a

potential conflict. Any Member subject to an alleged conflict of interest that does not fall within the scope of Section 2.7(a) shall be provided with a reasonable opportunity to be heard and to provide other Members with additional information and/or refute any allegations of its alleged conflict of interest prior to any Oversight Committee vote regarding such Member's alleged conflict of interest. Whether a conflict of interest exists as to a particular Member or group of Members will be determined on an individual basis and each Member shall have the opportunity to be heard and have the Oversight Committee vote in connection with its alleged conflict of interest. For the purpose of a vote under this Section to exclude a particular Member from a meeting, the Member not allowed to vote shall not be counted for a quorum. Also, for purposes of a vote under this Section, if Counsel recommended that more than one Member be excluded from a meeting for a substantially similar reason ("Excluded Members"), and if one or more of the Excluded Members requests a reasonable opportunity to be heard on the conflict issue, the Excluded Members shall not be entitled to vote on whether a conflict of interest exists on that issue for any other Excluded Member. Additionally, for the purpose of a vote under this Section, a majority vote is required to overrule Counsel's recommendation to the Oversight Committee on issues of potential conflicts. For clarification, in the event of a tie vote, Counsel's recommendation is adopted.

(c) Consistent with the foregoing, the Member having a conflict of interest shall not have access to summaries, analyses, reports, or work product prepared by the professionals of the Oversight Committee with respect to the matter in which the conflict of interest exists, except to the extent determined to be appropriate under the circumstances in the discretion of the Oversight Committee.

(d) Each Member of the Oversight Committee retains the right to appear in the Chapter 11 Case of the Debtor in respect of its own interests and to take a position different from that of the Oversight Committee, provided, however, that no Member shall purport to represent or speak for the Oversight Committee in connection therewith. While all Members acknowledge that they are acting in a fiduciary capacity as defined by law, nothing contained in these Bylaws shall: (i) prevent any Member from exercising or seeking to enforce or protect any of its rights as an individual creditor or other party-in-interest; or (ii) otherwise affect the ability of any Member to act in its capacity as an individual creditor or other party-in-interest as it may deem appropriate, whether or not such actions are opposed by the Oversight Committee.

## III.    ACTION BY REPRESENTATIVES OF THE OVERSIGHT COMMITTEE.

3.1    <u>Chairperson.</u> The Chairperson shall preside at the meetings of the Oversight Committee. Subject to the vote of the Oversight Committee, the Chairperson shall have such powers and duties as are set forth in these Bylaws or as the Oversight Committee assigns to the Chairperson.

3.2    <u>Emergency Motions.</u> Subject to Section 2.5, the Chairperson, with the advice of Counsel, or Counsel shall be empowered, without prior Oversight Committee action or consent, to consent to or otherwise act upon applications or motions for court orders on an emergency basis

if the Chairperson, with the advice of Counsel, or Counsel determines that it is not feasible to obtain a vote of the Oversight Committee pursuant to these Bylaws. The Chairperson and Counsel will make best efforts under the circumstances to communicate with as many Members of the Oversight Committee as possible before taking any such actions. The Oversight Committee shall be advised of any court orders, motions or applications so acted upon by the Chairperson pursuant to this section promptly thereafter.

3.3     <u>Subcommittees.</u> The Oversight Committee may, with the advice of Counsel, form one or more subcommittees to serve at the Oversight Committee's pleasure, with such powers and duties as the voting Members of the Oversight Committee shall determine.

3.4     <u>Secretary.</u> There shall be no secretary for the Oversight Committee. In lieu thereof, Counsel shall maintain minutes of the meetings which shall include a list of the Members present and the Oversight Committee action with respect to any motion or resolution. The minutes shall be circulated to the Members for approval as soon as practicable.

## IV.    MISCELLANEOUS.

4.1     <u>Confidentiality.</u> Each Member of the Oversight Committee is aware of the fiduciary duty to unsecured creditors of the Debtor and agree that it shall act in accordance with such duty in dealing with confidential information, which shall include (i) all information, documents, and matters of whatever nature and kind disclosed to the Oversight Committee (unless such information becomes generally available to the Oversight Committee on a non-confidential basis); (ii) all information or documents generated by the Oversight Committee, the Liquidating Agent, or Counsel; and (iii) all communications between Members in their capacity as such, including information regarding specific positions taken by Members, and all matters discussed at Oversight Committee meetings and the minutes thereof (collectively, (i), (ii) and (iii) are referred to as "<u>Confidential Information</u>").  The Confidential Information is confidential and shall not be disclosed or revealed to third parties in any manner whatsoever, except that a Member may share any such Confidential Information with its attorneys and financial consultants, provided that the person or entity receiving such disclosure agrees to be and is bound by these rules of confidentiality.

With respect to any required disclosure of Confidential Information by a Member to a third party by order of a court of appropriate jurisdiction, such Member shall promptly advise Counsel of such disclosure or prospective disclosure and shall reasonably cooperate with Counsel's efforts to obtain a protective order or other appropriate remedy to protect the confidentiality of such information.  Upon the resignation or removal of a Member, such Member shall promptly return to Counsel or destroy any non-public or confidential material (including copies thereof) received by the Member solely in its capacity and in the course of its tenure as a member of the Committee. Notwithstanding the resignation or removal of a member, such Member shall continue to be bound by the confidentiality provisions of these Bylaws.

4.2     <u>Media Communications.</u> No Member shall communicate directly with the public or the media as a representative of the Oversight Committee, unless the Oversight Committee has so authorized the communication to be made by majority vote. Nothing in these Bylaws shall

preclude any Member from sharing public, non-confidential information concerning this bankruptcy case with other creditors.

4.3     Expenses. Reasonable and actual expenses of the Oversight Committee and of Members incurred in connection with Oversight Committee business may be submitted to the Liquidating Agent, with a copy to Counsel, in order to seek reimbursement from the estate pursuant to Section 9.3 of the Plan. Unless approved in advance by the Chairperson, with the advice of Counsel, reasonable expenses shall not include the expenses of any person other than a designated representative of a Member, an alternate, or a person invited by the Oversight Committee or by the Chairperson to attend an Oversight Committee meeting or participate in an Oversight Committee-related function. Requests for reimbursement shall be itemized and reasonably detailed, and shall include receipts where practicable.

4.4     Amendments. These Bylaws may be amended, repealed, or adopted by the vote of a majority of the Members of the Oversight Committee entitled to vote.

4.5     Execution of Bylaws. These Bylaws may be executed in any number of counterparts, each of which shall constitute an original, and all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to these Bylaws by telecopier or email shall be as effective as delivery of a manually-executed counterpart of a signature page of these Bylaws.

**[SIGNATURE PAGE TO FOLLOW]**